**UNITED STATES COURT OF APPEALS
FOR THE FIRST CIRCUIT**

No. 14-1135

99 RESTAURANTS, LLC,

Petitioner - Appellant,

v.

CONSTANZA KIRAN, on behalf of herself
and all others similarly situated,

Respondent – Appellee.

Appeal from the United States District Court
for the District of Massachusetts

Case No. 13-CV-13048-WGY

**BRIEF OF RESPONDENT-APPELLANT CONSTANZA KIRAN**

Stephen Churchill (#30464)
Hillary Schwab (#118616)
Brant Casavant (#1145229)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260

**Dated:** June 24, 2014

# <u>TABLE OF CONTENTS</u>

TABLE OF CONTENTS....................................................................................... i

TABLE OF AUTHORITIES .............................................................................. ii

STATEMENT OF THE ISSUES......................................................................1

STATEMENT OF THE CASE...........................................................................1

SUMMARY OF ARGUMENT ..........................................................................4

ARGUMENT .......................................................................................................7

1.     There is binding precedent that class arbitrability is for the arbitrator to decide, and there is no intervening authority warranting a departure from that precedent. ..................................................................................7

     A.     This Court has ruled that class arbitrability is a question for the arbitrator...................................................................8

     B.     The Supreme Court has not abrogated this Court's rulings. ...............13

     C.     The Sixth Circuit's decision in *Reed Elsevier* does not warrant an abrogation of this Court's precedent. ...............................17

2.     The parties agreed to have the arbitrator decide "any" disputes between the parties, and "any" includes any issues about the scope of the arbitration agreement..................................................20

3.     The arbitration agreement permits class arbitration. ....................................22

CONCLUSION ..................................................................................................34

CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)..................................35

CERTIFICATE OF SERVICE .........................................................................36

i

# TABLE OF AUTHORITIES

**Cases**

*Adames v. Mitsubishi Bank, Ltd.*,
    133 F.R.D. 82 (E.D.N.Y. 1989)...........................................................................29

*Amchem Products, Inc. v. Windsor*,
    521 U.S. 591 (1997) ...........................................................................................28

*Anderson v. Comcast Corp.*,
    500 F.3d 66 (1st Cir. 2007) .............................................................................5, 8

*AT&T Mobility LLC v. Concepcion*,
    --- U.S. ---, 131 S.Ct. 1740 (2011) ....................................................................16

*Awuah v. Coverall North America, Inc.*,
    703 F.3d 36 (1st Cir. 2012) ......................................................................... 20, 24

*Bowser v. Chalifour*,
    334 Mass. 348 (1956) .........................................................................................27

*Central Pension Fund of the Intern. Union of Operating Engineers and
    Participating Employers*, 745 F.3d 1 (1st Cir. 2014)..........................................15

*Chassen v. Fidelity Nat. Financial, Inc.*,
    2014 WL 202763, *1 (D.N.J. Jan. 17, 2014) .....................................................19

*Circuit City Stores, Inc. v. Adams*,
    532 U.S. 105 (2001) ...........................................................................................29

*Edmonson v. Simon*,
    86 F.R.D. 375 (N.D. Ill. 1980) ..........................................................................29

*Electronic Data Sys. Corp. v. Attorney General*,
    440 Mass. 1020 (2003) .......................................................................................26

*Fantastic Sams Franchise Corp. v. FSRO Ass'n Ltd.*,
    683 F.3d 18 (1st Cir. 2012) ......................................................................... passim

*Green Tree Financial Corp. v. Bazzle*,
    539 U.S. 444 (2003) ..................................................................................... 15, 18

*Guida v. Home Sav. of Am., Inc.*,
    793 F. Supp. 2d 611 (E.D.N.Y. 2011) ...................................................................19

*Howsam v. Dean Witter Reynolds, Inc.*,
    537 U.S. 79 (2002) ........................................................................................ 10, 15

*In re A2P SMS Antitrust Litigation*,
    2014 WL 2445756, *1 (S.D.N.Y. May 29, 2014) .................................. 14, 19, 23

*In re A2P SMS Antitrust Litigation*,
    972 F. Supp. 2d 465 (S.D.N.Y. Sep. 16, 2013) ...................................................23

*Jock v. Sterling Jewelers Inc.*,
    646 F.3d 113 (2d Cir. 2011) ........................................................... 10, 13, 24

*JPMorgan Chase & Co.*,
    2013 WL 6068601, *1 (C.D. Cal. Nov. 14, 2013) ..............................................17

*Karp v. Cigna Healthcare, Inc.*,
    882 F. Supp. 2d 199 (D.Mass. 2012) ....................................................................8

*Lee v. JPMorgan Chase & Co.*, --- F. Supp. 2d ---,
    2013 WL 6068601, *1 (C.D. Cal. Nov. 14, 2013) ..............................................19

*Machado v. System4 LLC*,
    465 Mass. 508 (2013) .........................................................................................26

*Merrimack Valley Nat'l Bank v. Baird*,
    372 Mass. 721 (1977) .........................................................................................27

*Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*,
    945 F.2d 10 (1st Cir.1991) ....................................................................................7

*Minneapolis-St. Paul Mailers Union, Local #4 v. Northwest Publications, Inc.*,
    2003 WL 21672743, *1 (D.Minn. 2003) .............................................................31

*O'Brien v. Encotech Const. Servcs., Inc.*,
    203 F.R.D. 346 (N.D. Ill. 2001) ..........................................................................29

*Overka v. American Airlines, Inc.*,
    265 F.R.D. 14 (D. Mass. 2010) ...........................................................................29

*Oxford Health Plans, LLC v. Sutter*,
   --- U.S. ---, 133 S.Ct. 2064 (2013) ............................................................ passim

*Quilloin v. Tenet HealthSystem Philadelphia, Inc*.,
   673 F.3d 221 (3d Cir. 2012) ............................................................18

*Reed Elsevier, Inc. v. Crockett*,
   734 F.3d 594 (6th Cir. 2013) ....................................................... 5, 18

*Sampson v. U.S.*,
   724 F.3d 150 (1st Cir. 2013) ............................................................15

*San Juan Cable LLC v. P.R. Tel. Co., Inc*.,
   612 F.3d 25 (1st Cir. 2010) ............................................................7

*Sanchez v. U.S.*,
   740 F.3d 47 (1st Cir. 2014) ....................................................... 7, 8, 19

*Scott v. Aetna Servs., Inc.*,
   210 F.R.D. 261 (D. Conn. 2002) ............................................................29

*Skirchak v. Dynamics Research Corp.*,
   508 F.3d 49 (1st Cir. 2007) ............................................................5, 8

*Slahina v. West Penn Parking Corp.*,
   106 F.R.D. 419 (W.D. Pa. 1984) ............................................................29

*Smith & Wollensky Restaurant Group, Inc. v. Passow*,
   831 F. Supp. 2d 390 (D.Mass. 2011) ....................................................... 25, 27

*Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp.*,
   559 U.S. 662 (2010) ............................................................ passim

*Sutter v. Oxford Health Plans LLC*,
   675 F.3d 215 (3d Cir. 2012) ............................................................10

*United States v. Wogan*,
   938 F.2d 1446 (1st Cir. 1991) ............................................................7

*Vilches v. The Travelers Cos., Inc.*,
   413 Fed. Appx. 487 (3d Cir. 2011) ............................................................18

*Warfield v. Beth Israel Deaconess Medical Center*,
454 Mass. 390 (2009) ............................................................26

**Statutes**

29 U.S.C. § 216(b) ........................................................ 25, 28

Mass. Gen. Laws ch. 149, § 150 .................................... 25, 28

**Other Authorities**

American Arbitration Association, *Employment Arbitration
Rules and Mediation Procedures* ............................. 4, 12, 20

American Arbitration Association, *Supplementary Rules for
Class Arbitration* ...................................................... 12, 21, 22

David B. Lipsky & Ronald L. Seeber, *The Appropriate Resolution
of Corporate Disputes: A Report on the Growing Use of ADR
by U.S. Corporations* (Cornell/ PERC Inst. on Conflict Resol.,
Ithaca, N.Y.), Jan. 1998 .............................................29

*O'Charley's Inc. Prospectus* at 6 (Apr. 4, 2003), available at
http://www.sec.gov/Archives/edgar/data/864233/
000095014403004636/g80721b3e424b3.htm .....................30

**Rules**

Fed. R. Civ. P. 4(a)(1) .................................................32

**Treatises**

Restatement (Second) of Contracts § 206 (1981) .....................27

## STATEMENT OF THE ISSUES

1.      Where this Court repeatedly has held that it is for an arbitrator, and not a court, to determine whether an arbitration agreement requires individual arbitrations, should this Court abrogate its own precedent given a contrary decision from the Sixth Circuit?

2.      Where an arbitration agreement broadly provides that "any" and "all" controversies or disputes should be submitted to arbitration, and where the agreed-upon rules governing the arbitration give the arbitrator the power to interpret the agreement, should the parties' dispute about the interpretation of the agreement be decided by the arbitrator?

3.      Where both the broad language of the arbitration agreement and ordinary rules of contract interpretation require the conclusion that the arbitration agreement permits class arbitration, should the agreement be interpreted to permit class arbitration?

## STATEMENT OF THE CASE

Ms. Kiran filed a class demand with the American Arbitration Association ("AAA") on October 1, 2013, alleging wage claims under state and federal law. (ADD.10-15).[1] On November 27, 2013, the 99 filed a Petition to Stay Arbitration and to Compel Respondent to Arbitrate Claims on an Individual Basis in the

---

[1] "ADD." refers to the addendum to the 99's brief.

1

United States District Court for the District of Massachusetts.  (ADD.2).  On January 10, 2014, Ms. Kiran filed her opposition.  (ADD.3).  On January 13, 2014, the district court denied the 99's petition, ordering further that "[t]he case is administratively closed and may be reopened upon motion of any party once arbitration proceedings have concluded."  (ADD.3).  The 99 filed its notice of appeal on January 29, 2014.

## STATEMENT OF FACTS

Ms. Kiran worked for the 99 from 2000 through 2013.  (ADD.11).  On at least three occasions, she agreed to resolve any disputes arising from her employment through alternative dispute resolution.  (ADD.18).

The arbitration agreement between the 99 and its employees is set out in at least four documents: (1) an employment application (ADD.7), (2) an Alternative Dispute Resolution Employee sign off form (ADD.5), (3) an online Alternative Dispute Resolution agreement (ADD.6), and (4) an ADR Booklet (ADD.8-9). These documents provide that 99 employees must submit *any and all* disputes arising from or related to their employment to optional mediation or, if the matter is not resolved, to binding arbitration.  For example, the employment application that Ms. Kiran signed states, "The Ninety Nine Restaurant and our team members utilize an Open Door Policy and Alternative Dispute Resolution (ADR) to settle *any and all* employment disputes/conflicts."  (ADD.7) (emphasis added).  It goes

2

on to state that "[a]ny controversy or claim arising out of or related to 1) this application, or the breach thereof, 2) if hired, my compensation, employment or termination of employment…shall be settled by mediation and/or arbitration administered by the American Arbitration Association." (ADD.7). Likewise, a "sign off form" indicates that 99 employees "agree to submit *any* controversy or dispute arising out of or in connection with my compensation, employment or termination of employment, including but not limited to any statutory claims, such as discrimination or harassment to mediation and/or arbitration." (ADD.5) (emphasis added).

The ADR Booklet, meanwhile, repeatedly emphasizes that employees give up *nothing* (other than the substitution of an arbitrator for a judge and jury) by being forced into arbitration:

- Do I give up my legal rights by using arbitration instead of litigation? Your rights remain protected. You are simply agreeing to use a mediator and/or arbitrator instead of a judge and jury. The arbitrator can award *everything* a judge or jury could award you in court. ...

* * *

- What is ARBITRATION? …Arbitration is more formal than mediation, but less formal than the court system! The arbitrator has *all the legal powers of a judge* and can award a financial settlement just like a judge or jury.

(ADD.8-9) (emphasis added).

3

The ADR Booklet reinforces the 99's total commitment to arbitration for any and all disputes by making clear both that the 99 will not get upset if an employee relies on arbitration and that arbitration is a "benefit" offered to employees to ensure fair and respectful treatment for all employees:

> Will the Ninety Nine be upset if I use OPEN DOOR, MEDIATION or ARBITRATION to settle a dispute? Absolutely not! *The reason the Ninety Nine is offering this benefit is for employees to take advantage of it.* Treating People Right means giving each employee fair and respectful treatment at all times. …

(ADD.8).

The 99's arbitration policy further provides that arbitrations will be governed by the AAA's National Rules for the Resolution of Employment Disputes ("Employment Rules"). (ADD.5). Those rules are now known as the Employment Arbitration Rules and Mediation Procedures. (A.44a, 53a).

## SUMMARY OF ARGUMENT

The 99's appeal raises three principal questions: (1) is class arbitrability a gateway question presumptively to be decided by a court or an arbitrator, (2) even if it is a gateway question, did the parties here agree to have that question answered by an arbitrator, and (3) if it is a question for this Court, does the arbitration agreement permit class arbitration?

It is fundamental that this Court is bound by its prior decisions, with only limited exceptions. *Supra* at 7-8. This Court repeatedly has held that interpreting

4

an arbitration agreement to determine whether it requires individual arbitrations is a question for the arbitrator, not a court. *Fantastic Sams Franchise Corp. v. FSRO Ass'n Ltd.*, 683 F.3d 18, 26 (1st Cir. 2012); *Skirchak v. Dynamics Research Corp.*, 508 F.3d 49, 56 (1st Cir. 2007); *Anderson v. Comcast Corp.*, 500 F.3d 66, 72 (1st Cir. 2007). *Supra* at 8-13.  The Supreme Court has not abrogated these holdings, either in *Oxford Health Plans, LLC v. Sutter*, --- U.S. ---, 133 S.Ct. 2064 (2013), or in any other rulings. *Supra* at 13-17.  And the Sixth Circuit's conflicting decision in *Reed Elsevier, Inc. v. Crockett,* 734 F.3d 594 (6th Cir. 2013), which was wrongly decided and has been rejected by other courts, provides no basis for this Court to abrogate its prior decisions. *Supra* at 17-19.

Even if class arbitrability presumptively were a question for a court to decide, parties may agree to put that question to an arbitrator. *Supra* at 20-22. Given the terms of the ADR agreement in this case, the parties plainly agreed to have an arbitrator decide class arbitrability. *Supra* at 21-22.  That conclusion follows not only from the broad language in the agreement – in which the parties agreed to have an arbitrator resolve "any" and "all" disputes between them – but from their agreement to follow AAA procedures, which expressly provide than an arbitrator will decide class arbitrability. *Id.*

If the Court concludes that it must construe the agreement to determine whether the agreement permits class arbitration, then there is only one possible

result: the agreement should be construed to permit class arbitration. That result is compelled by the unusually broad language in the arbitration agreement. *Supra* at 24-25. Not only does the agreement repeatedly invoke the terms "any" and "all" with respect to what issues must be arbitrated, but it assures employees that they will not lose *any* rights and that an arbitrator will have *all* of the same powers as a judge. *Id.* Construing the agreement to permit class arbitration also is compelled by Massachusetts rules of contract construction, which require that ambiguities be resolved in favor of the broadest possible scope of arbitration and that ambiguities be resolved against the drafter, here the 99. *Supra* at 25-27. Class arbitration also is consistent with industry custom, because class actions generally, and class arbitrations more specifically, are common in employment litigation. *Supra* at 27-29. The 99's heavy reliance on the use of singular pronouns is misplaced, because it is improper to place so much weight on conventions self-evidently chosen for drafting convenience. *Supra* at 31-32.

For all of these reasons, discussed in more detail below, the district court's dismissal of the petition should be affirmed.

# **ARGUMENT**

1. **There is binding precedent that class arbitrability is for the arbitrator to decide, and there is no intervening authority warranting a departure from that precedent.**

This Court has held "time and again" that "prior panel decisions are binding upon newly constituted panels in the absence of supervening authority sufficient to warrant disregard of established precedent." *United States v. Wogan*, 938 F.2d 1446, 1449 (1st Cir. 1991) (citations omitted). This principle has many justifications, including "[t]he orderly development of the law, the need for stability, the value of results being predictable over time, and the importance of evenhanded justice." *Metcalf & Eddy, Inc. v. Puerto Rico Aqueduct & Sewer Auth.*, 945 F.2d 10, 12 (1st Cir.1991). And this principle holds true even where another circuit has issued a subsequent opinion that conflicts with this Court's precedent. *San Juan Cable LLC v. P.R. Tel. Co., Inc.*, 612 F.3d 25, 34 (1st Cir. 2010) (contrary conclusion of another circuit court does not "divest [a panel] opinion of its customary stare decisis effect within the circuit"). The only way that conflicting opinions from other circuits will justify a departure from this Court's controlling precedent is through a "narrowly construed" and "exacting" standard – i.e., that this Court's prior panel would have reached a different result if it had known of "the development of the law in other circuits." *Sanchez v. U.S.*, 740 F.3d 47, 56 (1st Cir. 2014). That subsequent development of the law would have to

7

"paint a picture of a rush to the exit so as to allow [this Court] to overrule [its] controlling precedent." *Id*. at 57. Based on these principles, the district court's dismissal should be affirmed, because (1) this Court has ruled that class arbitrability is a question for the arbitrator, (2) the Supreme Court has not ruled to the contrary, and (3) the single, Sixth Circuit case upon which the 99 relies falls far short of warranting an abandonment of this Court's precedent.

## A. This Court has ruled that class arbitrability is a question for the arbitrator.

This Court repeatedly has held that determining whether an arbitration agreement requires individual arbitration is for arbitrators to decide, not courts. *See, e.g., Skirchak*, 508 F.3d at 56 ("when claims are submitted to arbitration, the question of whether class arbitration is forbidden is not a question of arbitrability, but initially a question of contract interpretation and should be decided in the first instance by an arbitrator") (citations omitted); *Anderson*, 500 F.3d at 72 (arbitrator should construe arbitration agreement to determine class arbitrability). In addition to the district court in this case, other district courts have followed this Court's rulings. *See, e.g., Karp v. Cigna Healthcare, Inc*., 882 F. Supp. 2d 199, 206 n.6 (D.Mass. 2012) ("When an arbitration agreement is ambiguous, the determination of whether it bars or allows class arbitration is normally a question for the arbitrator, not the courts, to decide.").

The Court recently revisited this question and again ruled that arbitrators, and not courts, must decide whether an arbitration agreement requires individual arbitration. *Fantastic Sams,* 683 F.3d at 26. In that case, an association of Fantastic Sams franchisees filed arbitration demands against their franchisor, and the franchisor filed a petition to stay the arbitration and compel the franchisees to arbitrate their claims individually. *Id*. at 19. The district court allowed the petition with respect to franchisees whose agreements had express prohibitions on class arbitration. *Id*. With respect to franchisees whose arbitration agreements did not contain any express prohibitions on class or collective arbitration (like the arbitration agreement at issue here), the court denied the petition. *Id*. at 19-20. On appeal, this Court affirmed the district court's denial of the petition. *Id*. at 19. The two controlling reasons for that decision apply with equal force to this case.

First, this Court squarely rejected the argument that *Stolt-Nielsen, S.A. v. AnimalFeeds Int'l Corp*., 559 U.S. 662 (2010), precludes class arbitration, as a matter of law, where an agreement is silent as to class arbitration. *Id*. at 21-22. The Supreme Court's holding that class arbitration was not permissible in *Stolt-Nielsen* resulted from the parties' *stipulation* that they had reached *no agreement* on class arbitration. *Id*. at 21. Where parties dispute whether they agreed on class or collective arbitration, as in *Fantastic Sams* and as in this case, *Stolt-Nielsen* does not preclude class arbitration as a matter of law. *Id*. at 22-23. In reaching this

9

conclusion, this Court followed two other circuits that have addressed the same issue. *Id*. at 22, *citing Sutter v. Oxford Health Plans LLC*, 675 F.3d 215 (3d Cir. 2012), *aff'd* --- U.S. ---, 133 S.Ct. 2064 (2013), and *Jock v. Sterling Jewelers Inc*., 646 F.3d 113 (2d Cir. 2011), *cert. denied* --- U.S. ---, 132 S.Ct. 1742 (2012).

Second, this Court rejected the argument that a court must decide as a "gateway" question whether parties to an arbitration agreement limited themselves to individual arbitration. *Id*. at 24-25. It is well established that "in certain limited circumstances…courts should assume that the parties to an arbitration agreement intended the courts to decide 'dispositive gateway… question[s] of arbitrability.'" *Id*. at 24-25, *quoting Howsam v. Dean Witter Reynolds, Inc*., 537 U.S. 79, 83 (2002) (internal quotation marks omitted; brackets in original). But this "interpretive rule must be construed narrowly," because many questions can be posed as "dispositive" or "gateway" issues. *Id*. at 25, *citing Howsam*, 547 U.S. at 83.

The two types of questions that have been construed as "gateway" issues are: (1) "whether the parties have a valid arbitration agreement at all," and (2) "whether a concededly valid arbitration clause encompasses a particularly type of controversy." *Id*. (citations omitted). The first question is not presented here, because the 99 is not disputing the existence of a valid arbitration agreement. The second question also is not presented, because the 99 does not contend that Ms.

Kiran's underlying wage claims fall outside the 99's broadly worded arbitration policy. *Compare id*. at 25 (in rejecting argument that court must decide on class arbitrability, noting that petitioner "has conceded that [respondent's] underlying claims fall within the arbitration agreements").

In reaffirming the proposition that arbitrators should decide questions of class arbitrability, this Court noted that the "narrow class of 'questions of arbitrability'" (to be decided by courts) must be distinguished from "procedural questions which grow out of [a] dispute" (to be decided by arbitrators). *Id*. (internal quotation marks and citations omitted; brackets in original). The question of whether a silent arbitration agreement permits class arbitration "is of the kind that an arbitrator would typically decide, and does not raise an issue of 'arbitrability.'" *Id*.[2]

That an arbitrator would "typically decide" issues of class arbitrability is demonstrated by the AAA's rules, which make clear that the scope of an arbitration agreement is a question for the arbitrator. The rules expressly state that "[t]he arbitrator shall have the power to rule on his or her own jurisdiction,

---

[2]  Although *Fantastic Sams* involved an "associational action" rather than a "class action," that distinction is of no consequence here, because the two principal reasons for this Court's holding apply with equal force to this case – that is, (1) *Stolt-Nielsen* does not establish, as a matter of law, that a silent arbitration agreement precludes class arbitration, and (2) an arbitrator's determination of the scope of an arbitration agreement is not a gateway issue that must be decided by a court.

including any objections with respect to the existence, *scope* or validity of the arbitration agreements."  (A.55a) (emphasis added).  The rules further provide that "[t]he arbitrator shall interpret and apply these rules as they relate to the arbitrator's powers and duties."  (A.66a).

The AAA also has Supplementary Rules for Class Action Arbitration ("Supplementary Rules"), which plainly apply to this case.  (A.82a) (Supplementary Rules "*shall* apply to *any* dispute arising out of an agreement that provides for arbitration pursuant to *any* of the rules of the [AAA] where the party submits a dispute to arbitration on behalf of or against a class or proposed class, and shall supplement any other applicable AAA rules.") (emphasis added).  The Supplementary Rules include a specific procedure for submitting the question of class arbitrability to the arbitrator.  (A.83a) ("Upon appointment, the arbitrator shall determine as a threshold matter, in a reasoned, partial final award on the construction of the arbitration clause, whether the applicable arbitration clause permits the arbitration to proceed on behalf of or against a class….").

When evaluating what arbitrators "typically decide," it is also instructive to consider what happens in other cases.  It is instructive, for example, that the parties in *Oxford Health* – a case in which class arbitrability issues were hotly litigated all the way to the Supreme Court – the parties *did not dispute* that the arbitrator should decide class arbitrability in the first instance.  133 S.Ct. at 2068 n.2.  The same

holds true for other recent cases in which class arbitrability issues were vigorously contested.  *See, e.g., Jock*, 646 F.3d at 116 ("The parties submitted to the arbitrator the question whether [the arbitration] agreement permitted or prohibited class arbitration.")  And there are dozens of decisions on the AAA's online docket where arbitrators construed agreements – as required by the AAA's Supplementary Rules – to decide if they permit class arbitration (referred to as "clause construction awards").  *See* AAA Class Arbitration Case Docket, available at www.adr.org.  All of these cases, like the AAA's rules themselves, support the conclusion that class arbitrability is an issue that arbitrators "typically decide."

**B.     The Supreme Court has not abrogated this Court's rulings.**

The Supreme Court's decision in *Oxford Health Plans, LLC v. Sutter*, --- U.S. ---, 133 S.Ct. 2064 (2013) did not abrogate this Court's precedent.  In *Oxford Health*, the Court expressly stated that it "has *not yet decided* whether the availability of class arbitration is a question of arbitrability…, [b]ut this case gives us *no opportunity* to do so," because the parties had stipulated that the arbitrator should determine whether the agreement authorized class procedures.  133 S.Ct. at 2068 n.2 (emphasis added).  Remarkably, the 99 contends that by this footnote, in which the Court expressly stated that the case presented *no opportunity* to address the issue, the Court "strongly suggested that if the defendant had not consented to let the arbitrator decide class arbitrability, that issue should have been decided by a

13

court." (Appellant's Brief, p.12) (emphasis in original). That conclusion is impossible to square with what the Supreme Court actually said, for how can the Court's express statement that it *has not* and *is not* deciding an issue be construed as an opinion – implicit or otherwise – on that very issue?

Even if this Court were inclined to engage in judicial soothsaying to predict how the Supreme Court would rule if this issue were fully briefed and argued (unlike in *Oxford Health*, where the parties stipulated that the arbitrator would decide class arbitrability), the *Oxford Health* footnote does not provide meaningful help. The 99 appears to rely on a single phrase in the footnote, which states that "*Stolt-Nielsen* flagged that it [i.e., determining whether an agreement provides for class arbitration] *might* be a question of arbitrability." (Appellant's Brief, p.13, *citing Oxford Health*, 133 S.Ct. at 2068 n.2) (emphasis added). But what does that mean? All the Supreme Court "flagged" on that subject in *Stolt-Nielsen* is that it had not yet ruled on the issue. *Stolt-Nielsen*, 559 U.S. at 680 (noting that "only [a] plurality decided that question"). It is basic that if the Court had not yet ruled on the issue, it "might" rule either way in the future. That is all the footnote in *Oxford Health* means. *See In re A2P SMS Antitrust Litigation*, 2014 WL 2445756, at *11 (S.D.N.Y. May 29, 2014) (observing that *Oxford Health* footnote "is [a] far cry from holding – or even suggesting – that *Bazzle* reached the wrong result"). Such a bland statement hardly serves as a basis for undoing this Court's precedent.

14

Moreover, although a majority of the Supreme Court has not yet ruled on the issue, a plurality of the Court has. *Green Tree Financial Corp. v. Bazzle*, 539 U.S. 444, 451-53 (2003). This Court regularly looks to plurality opinions as persuasive authority. *See, e.g., Central Pension Fund of the Intern. Union of Operating Engineers and Participating Employers*, 745 F.3d 1, 6 (1st Cir. 2014), *citing City of Riverside v. Rivera*, 477 U.S. 561, 580-81 (1986) (plurality opinion); *Sampson v. U.S.*, 724 F.3d 150, 169 (1st Cir. 2013), *citing Teague v. Lane*, 489 U.S. 288, 310 (1989) (plurality opinion).

In *Bazzle*, a plurality ruled that determining whether an agreement permits class arbitration is not one of the "limited circumstances" when parties expect a court, rather than an arbitrator, to decide the issue in the first instance. 539 U.S. at 452-53, *citing Howsam,* 537 U.S. at 83 (limited circumstances involve matters that "contracting parties would likely have expected a court" to decide) (other citations omitted). Class arbitrability "does not fall into this narrow exception," because it "concerns neither the validity of the arbitration clause nor its applicability to the underlying dispute between the parties." 539 U.S. at 452. It concerns, instead, a dispute about "what *kind of arbitration proceeding* the parties agreed to." *Id.* (emphasis in original). Indeed, where the very rules chosen by the parties here (and, in reality, chosen by the 99 through its own adhesion contract) expressly give

*arbitrators* the right to address class arbitrability, how can the 99 credibly argue that the parties expected a court to decide that issue?

Neither *Stolt-Nielsen*, *Oxford Health*, nor *AT&T Mobility LLC v. Concepcion*, --- U.S. ---, 131 S.Ct. 1740 (2011), addressed this same issue. Collectively, those cases confirmed the unexceptional proposition that a plurality opinion is not binding. *Stolt-Nielsen*, 559 U.S. at 680; *Oxford Health*, 133 S.Ct. at 2068 n.2. And they made the unremarkable observation that class arbitration has differences relative to individual arbitration. *Stolt-Nielsen*, 559 U.S. at 685-87; *Concepcion*, 131 S.Ct. at 1750-52. Those cases provide no authority, binding or persuasive, on the question now before this Court, which is whether class arbitration is a gateway question presumptively for a court to decide.

That the Court has described the change from individual arbitration to class arbitration as "fundamental," *Stolt-Nielsen*, 559 U.S. at 686, does not lead to the conclusion that a court must decide class arbitrability. After all, the line that separates questions that a court must decide from those that an arbitrator is empowered to decide does not turn on whether the arbitrator's decision will result in a "fundamental" consequence; it turns on whether the issue is one the parties typically would expect a court to decide. Arbitrators routinely are called upon to decide questions that result in "fundamental" consequences to the parties, including whether a party is entitled to any remedies. The Supreme Court's reason

16

for highlighting the difference between individual and class arbitrations was not to change the law on *who* decides class arbitrability; it was to make the point that *whoever is making that decision* should not infer that an agreement to arbitrate necessarily implies consent to class arbitration. *Id*. at 685 ("An implicit agreement to authorize class-action arbitration, however, is not a term that the arbitrator may infer solely from the fact of the parties' agreement to arbitrate."). *See also Lee v. JPMorgan Chase & Co.*, 2013 WL 6068601, at *3 (C.D. Cal. Nov. 14, 2013) ("*Stolt-Nielsen* concerns only *how to decide* whether an arbitration agreement authorizes class arbitration, not *who decides*") (emphasis in original).

As a result, the only Supreme Court authority on the question of *who* decides class arbitrability is the persuasive authority from the plurality opinion in *Bazzle*. That authority is in line with this Court's precedent, not contrary to it, so there is no basis for this Court to abrogate its prior rulings.

## C.    The Sixth Circuit's decision in *Reed Elsevier* does not warrant an abrogation of this Court's precedent.

In addition to *Oxford Health*, the 99 relies heavily on the Sixth Circuit's decision in *Reed Elsevier*. *Reed Elsevier*, however, is contrary to this Court's precedent and was wrongly decided, because it conflates the distinction between who decides class arbirability and how that decision is made. The Sixth Circuit's holding was based primarily on *Stolt-Nielsen* and *Concepcion*, to the extent those cases noted differences between individual and class arbitrations. *Reed Elsevier*,

17

734 F.3d at 598-99.  The Sixth Circuit's analysis, however, makes an unwarranted leap of logic.  Simply because the Supreme Court noted differences between individual arbitration and class arbitration, it does not follow that the Court would conclude, contrary to the plurality opinion in *Bazzle*, that class arbitrability is a gateway question presumptively for a court to decide.  Indeed, other than noting that the plurality opinion in *Bazzle* was not binding, the Sixth Circuit did not explain why that opinion was wrong.  *Id*. at 597-98.

No other circuit has followed the reasoning of *Reed Elsevier*.  On the contrary, the Third Circuit reached a contrary result in *Quilloin v. Tenet HealthSystem Philadelphia, Inc*., 673 F.3d 221 (3d Cir. 2012).  In *Quilloin*, which also was decided after *Stolt-Nielsen* and *Concepcion*, the Third Circuit stated that "the actual determination as to whether class action is prohibited is a question of interpretation and procedure for the arbitrator."  *Id*. at 232.  *See also Vilches v. The Travelers Cos., Inc*., 413 Fed. Appx. 487, 491-92 (3d Cir. 2011) ("Where contractual silence is implicated, 'the arbitrator and not a court should decide whether a contract [was] indeed silent' on the issue of class arbitration,' and 'whether a contract with an arbitration clause forbids class arbitration.'") (brackets in original), *quoting Stolt-Nielsen*, 130 S.Ct. at 1771-72.

Two of three district courts that have considered *Reed Elsevier* as potentially persuasive authority have rejected its analysis.  *Compare In re A2P SMS Antitrust*

18

*Litigation*, 2014 WL 2445756, at *11-12 (S.D.N.Y. May 29, 2014) (concluding,
after extensive analysis, that arbitrator should decide class arbitrability), *and Lee v.
JPMorgan Chase & Co.*, --- F. Supp. 2d ---, 2013 WL 6068601, at *4 (C.D. Cal.
Nov. 14, 2013) (same), *with Chassen v. Fidelity Nat. Financial, Inc*., 2014 WL
202763, at *6 (D.N.J. Jan. 17, 2014) (concluding that court should decide issue).
In both *In re A2P* and *Lee*, the district courts noted the important distinction – left
unaddressed by the Sixth Circuit – between who decides class arbitrability and
how that decision is made.  *In re A2P*, 2014 WL 2445756, at *11, *citing Lee* 2013
WL 6068601, at *3, *and Guida v. Home Sav. of Am., Inc*., 793 F. Supp. 2d 611,
616 & n.3, 618-19 (E.D.N.Y. 2011).  And in *In re A2P*, the district court
extensively surveyed the relevant authority from other district courts, and
concluded that "the weight of authority likely favors Plaintiffs' position" – i.e., that
the arbitrator should decide class arbitrability.  *Id*. at *9 (citations omitted).

Based on the current state of the law, the Sixth Circuit's holding in *Reed
Elsevier* provides inadequate grounds for this Court to abrogate is prior decisions.
While the Sixth Circuit has construed recent Supreme Court decisions as requiring
a change in long-settled law, most courts have construed those decisions
differently and have stayed the course.  There is, to use this Court's phrase, no
"rush to the exit so as to allow [the Court] to overrule [its] controlling precedent."
*Sanchez*, 740 F.3d at 57.

2.    **The parties agreed to have the arbitrator decide "any" disputes between the parties, and "any" includes any issues about the scope of the arbitration agreement.**

Even if class arbitrability were presumptively a gateway question for a court (it is not), parties can nonetheless agree to put the question to an arbitrator. *Fantastic Sams*, 683 F.3d at 25 (citation omitted). That is clearly what happened here. The 99 used broad language to praise arbitration and, more importantly, to emphasize that "any" and "all" disputes between them would be resolved by an arbitrator, including any disputes arising from "[the] application" – i.e, the application in which Ms. Kiran agreed to the ADR program. (ADD.7). Plainly, one of the disputes between the parties is whether the arbitration agreement permits class arbitration. Under the terms of the agreement, that dispute must be put to the arbitrator.

In addition to the broad scope of what must be arbitrated, the parties agreed that any arbitration would proceed "under the AAA's National Rules for the Resolution of Employment Disputes." (ADD.5). When an agreement references another document in such an explicit manner, the document is incorporated into and becomes part of the agreement. *Awuah v. Coverall North America, Inc.*, 703 F.3d 36, 43 (1st Cir. 2012) (citations omitted). The AAA's rules *expressly* provide that the arbitrator has the authority to determine the scope of the arbitration agreement. (A.55a) ("The arbitrator shall have the power to rule on his or her own

jurisdiction, including any objections with respect to the existence, *scope* or

validity of the arbitration agreements.").  And the Supplementary Rules provide an

explicit procedure for class cases – a procedure that calls for the arbitrator to

determine whether the applicable agreement permits class arbitrations. (A.83a)

("Upon appointment, *the arbitrator shall determine* as a threshold matter, in a

reasoned, partial final award on the construction of the arbitration clause, whether

the applicable arbitration clause permits the arbitration to proceed on behalf of or

against a class….").

 The 99's contention that this clause construction procedure applies "<u>only</u>

where the parties have agreed that the arbitrator should decide class arbitrability"

(Appellant's Brief, p.25) (emphasis in original) is wrong.  The Rules state, quite

plainly, that this is the procedure to be followed in every case filed with the AAA

as a class arbitration.  (A.82a).  The 99 chose to use the AAA and its procedures,

and that is what Ms. Kiran agreed to, so the 99 cannot now seek to change the

rules.

 Likewise, the 99's argument that the Supplementary Rules may not be cited

in support of class arbitration (Appellant's Brief, p.25) misses the mark.  Although

the Supplementary Rules state that they may not be cited in connection with a

clause construction argument[3] – i.e., to support or refute a claim that a particular agreement provides for class arbitration – that is clearly different from saying they have no bearing on whether the parties agreed to have the arbitrator construe the agreement in the first place.  As noted above, there is a clear distinction between *who* decides class arbitrability and *how* a decision on class arbitrability is made. The Supplementary Rules' limitation on how they may be cited relates to the second issue, not the first.

In short, the 99's chosen rules provide that the arbitrator has authority to make the clause construction decision.  The 99 is bound by that choice.

**3.     The arbitration agreement permits class arbitration.**

In the event the Court concludes that class arbitrability is a gateway question that must be answered by a court and that can be answered as a matter of law, it should answer that question by permitting class arbitration in this case.  As a starting point, the 99's argument that a so-called silent arbitration agreement can never be construed to permit class arbitration can be summarily disposed of, because this Court has rejected that very argument.  *Fantastic Sams*, 683 F.3d at 22 ("We thus reject the very different precept…that there must be express contractual language evincing the parties' intent to permit class or collective arbitration.").

---

[3]  The Supplementary Rules state, "In construing the applicable arbitration clause, the arbitrator shall not consider the existence of these Supplementary Rules, or another AAA rules, to be a factor either in favor of or against permiting the arbitration to proceed on a class basis."  (A.83a).

The Supreme Court did not reach the issue in *Stolt-Nielsen*, because the parties had stipulated away the issue. *Id.* at 21-22 ("The Court had no occasion in *Stolt-Nielsen* to consider what may constitute a 'contractual basis for class arbitration.'"). More recently, in a case where the parties did not stipulate away the issue of class arbitrability, the Supreme Court ruled that an arbitrator did not exceed his authority by construing a silent contract to permit class arbitration. *Oxford Health*, 133 S.Ct. at 2070-71.

Contrary to this controlling authority from both the Supreme Court and this Court, the 99 defiantly argues that "silence alone *is dispositive* and *compels* the conclusion that the parties did not agree to class arbitration." (Appellant's Brief, p.28) (emphasis added). In making this argument, the 99 disregards this Court's rulings and relies instead on the Sixth Circuit's ruling in *Reed Elsevier*, as well as a handful of non-binding cases from other jurisdictions, including at least one case where the court later reversed its own position. (Id. at 28-30). *Compare In re A2P SMS Antitrust Litigation*, 972 F. Supp. 2d 465, 495 n.16 (S.D.N.Y. Sep. 16, 2013) ("the Supreme Court has held that arbitration clauses will not be read to implicitly authorize class-wide arbitration unless such a provision is explicitly contained in the agreement") *with In re A2P SMS Antitrust Litigation*, 2014 WL 2445756 (S.D.N.Y. May 29, 2014) ("the Court must revisit its September 16, 2013 decision, particularly as to footnote 16," because, in fact, "*Stolt-Nielsen* does not foreclose

the possibility that parties may implicitly, rather than expressly, agree to authorize class-action arbitration"), *citing Jock*, 646 F.3d at 123.

As a result, if this Court rules that it must decide class arbitrability as a matter of law, it is faced with the task of construing the parties' arbitration agreement, meaning that it "must give effect to the contractual rights and expectations of the parties." *Fantastic Sams*, 683 F.3d at 22 (internal quotation marks and citations omitted). And "'[i]n certain contexts, it is appropriate to presume' that the parties 'implicitly authorize[d]' class arbitration." *Id*. (brackets in original; citation omitted).

In the context of a silent arbitration agreement, state contract law will determine whether the parties implicitly authorized class arbitration. *Stolt-Nielsen*, 559 U.S. at 681 ("the interpretation of an arbitration agreement is generally a matter of state law"). *See also Awuah*, 703 F.3d at 42 ("When deciding whether the parties agreed under the FAA to arbitrate a certain matter, courts generally…should apply ordinary state-law principles that govern the formation of contracts.") (internal quotation marks and citation omitted).

Under Massachusetts law, the arbitration agreement in this case is so broad that it unambiguously encompasses all possible claims, including class claims. As this Court succinctly emphasized when considering the scope of another Massachusetts arbitration agreement, "[a]ll means all." *Awuah*, 703 F.3d at 43

(internal quotation marks omitted).  *See also Smith & Wollensky Restaurant Group, Inc. v. Passow*, 831 F. Supp. 2d 390, 392 (D.Mass. 2011) (in upholding reasonableness of arbitrator's ruling that arbitration agreement permitted class arbitration, noting agreement's use of "any claim" language).  The "all" in this case is not expressly limited – as many arbitration agreements are – to exclude class or collective actions.  On the contrary, the arbitration agreement emphasizes that employees do not give up any rights as a result of the arbitration agreement, other than substituting an arbitrator for a judge and jury.

> Do I give up my legal rights by using arbitration instead of litigation?  *Your rights remain protected*.  You are simply agreeing to use a mediator and/or arbitrator instead of a judge and jury.  The arbitrator can award *everything* a judge or jury could award you in court. …

(ADD.8) (emphasis added).  *See also* ADD.9 ("The arbitrator has *all the legal powers of a judge*") (emphasis added).

The federal and Massachusetts statutes upon which Ms. Kiran relies specifically provide for class or collective actions.  *See Smith & Wollensky*, 831 F. Supp. 2d at 392 (citing this fact to support reasonableness of interpreting arbitration agreement to cover class claims).  Under the FLSA, an individual has the right to bring a claim "for and in behalf of himself…and other employees similarly situated."  29 U.S.C. § 216(b).  The same is true under Massachusetts law.  *See, e.g.*, Mass. Gen. Laws ch. 149, § 150 (individual may "institute and prosecute in his own name and on his own behalf, or for himself and for others

25

similarly situated, a civil action….").  In light of this statutory language and the importance of strict enforcement of the wage laws, the Supreme Judicial Court recently held that employees have a *substantive right* to bring wage claims on a class-wide basis.  *Machado v. System4 LLC*, 465 Mass. 508, 514-15 (2013) ("Wage Act provides for a substantive right to bring a class proceeding [and] very legitimate policy rationales underl[ie] the Legislature's decision to provide for class proceedings under the Wage Act").  If the arbitration agreement were construed to preclude class arbitration, then – contrary to the plain language of the agreement – the 99's employees *would* be giving up their rights, and the arbitrator *would not* have all the legal powers of a judge.

At least two other principles of Massachusetts law reinforce Ms. Kiran's interpretation of the arbitration agreement.  First, Massachusetts has a strong public policy favoring arbitration, so "where a contract has an arbitration clause that is 'broad' in its reach, there is a rebuttable presumption that a contract dispute is covered by the clause, and doubts whether a particular dispute comes within the scope of the clause should be resolved in favor of arbitration."  *Warfield v. Beth Israel Deaconess Medical Center*, 454 Mass. 390, 396 (2009) (citations omitted).  And, second, it has long been established that ambiguities or uncertainties in an agreement are to be resolved against the drafter.  *Electronic Data Sys. Corp. v. Attorney General*, 440 Mass. 1020, 1021 (2003), *citing Merrimack Valley Nat'l*

26

*Bank v. Baird*, 372 Mass. 721, 724 (1977), and *Bowser v. Chalifour*, 334 Mass. 348, 352 (1956).  *See also Restatement (Second) of Contracts* § 206 (1981) ("[i]n choosing among the reasonable meanings of a promise or agreement or a term thereof, that meaning is generally preferred which operates against the party who supplies the words or from whom a writing otherwise proceeds").  These two principles, individually and collectively, support the conclusion that class arbitration is permitted here.

Interpreting the arbitration agreement to permit class arbitrations is also supported by industry custom.  *See Passow*, 831 F. Supp. 2d at 392 (in upholding arbitrator's allowance of class arbitration, reciting arbitrator's reliance on fact that "wage and hour claims…are frequently pursued as class or collective actions, and both [parties] must be deemed to understand that") (internal quotation marks omitted; brackets added).  In *Stolt-Nielsen*, the Court discussed what was customary in the shipping industry, because those customs supported the conclusion that petitioner Stolt-Nielsen did not consent to class arbitration.  559 U.S. at 674 n.6 ("evidence of 'custom and usage' is relevant to determining the parties' intent when an express agreement is ambiguous") (citations omitted).  The Court noted, for example, that there was undisputed evidence that the maritime agreement at issue "had '*never* been the basis of a class action.'"  *Id.* at 674 (citation omitted; emphasis added).  Similarly, there was an expert opinion "that

'sophisticated, multinational commercial parties of the type that are sought to be included in the class would *never* intend that the arbitration clauses would permit a class arbitration.'" *Id.* at 674 & n.6 (citation omitted; emphasis added). *See also id.* at 684 (in criticizing arbitration panel's decision, Court recites to facts that the parties are sophisticated business entities and that "there is no tradition of class arbitration under maritime law").

Unlike the customs of maritime law, there is a well-established use of class actions – both in court and in arbitration – in the context of wage and other employment claims. There are at least three reasons to explain the prevalence of class or collective actions for wage and hour claims. First, as discussed above, wage statutes specifically allow for class or collective actions. 29 U.S.C. § 216(b); Mass. Gen. Laws ch. 149, § 150. Second, the prevalence of class wage claims fits squarely with one of the central purposes of the class action mechanism, which is to help ensure that small individual claims do not go unenforced. *See Amchem Products, Inc. v. Windsor*, 521 U.S. 591, 617 (1997) ("The policy at the very core of the class action mechanism is to overcome the problem that small recoveries do not provide the incentive for any individual to bring a solo action prosecuting his or her rights. A class action solves this problem by aggregating the relatively paltry potential recoveries into something worth someone's (usually an attorney's) labor.") (citation omitted; internal quotation marks omitted). Third, class actions

have particular importance in the employment context, where fear of retaliation

may have a chilling effect on workers bringing claims on an individual basis.[4]

Given the increased prevalence of workplace arbitration agreements[5] and the

need for class actions in wage cases, it is unsurprising that class arbitrations of

employment claims are common.  The AAA docket for class action cases includes

over 100 proceedings involving such claims.  *See* AAA Class Arbitration Case

Docket, available at www.adr.org.  The frequent use of class proceedings in wage

cases stands in sharp contrast to the wholesale absence of class proceedings in

maritime law.  Unlike the defendant in *Stolt-Nielsen*, which had no reason to

contemplate a class arbitration of maritime claims, the parties here had obvious

---

[4] Risk of reprisal by an employer is well recognized as weighing in favor of class actions.  *Overka v. American Airlines, Inc.*, 265 F.R.D. 14, 24 (D. Mass. 2010). *See also O'Brien v. Encotech Const. Servcs., Inc.*, 203 F.R.D. 346, 350 (N.D. Ill. 2001) (fear of employer retaliation against individual workers is "a very important concern" because "the nature of the economic dependency involved in the employment relationship is inherently inhibiting"); *Scott v. Aetna Servs., Inc.*, 210 F.R.D. 261, 268 (D. Conn. 2002); *Adames v. Mitsubishi Bank, Ltd.*, 133 F.R.D. 82, 89 (E.D.N.Y. 1989); *Slahina v. West Penn Parking Corp.*, 106 F.R.D. 419, 423 (W.D. Pa. 1984); *Edmonson v. Simon*, 86 F.R.D. 375 (N.D. Ill. 1980).

[5] The widespread use of arbitration clauses in the workplace is longstanding and well documented.  *See, e.g.*, David B. Lipsky & Ronald L. Seeber, *The Appropriate Resolution of Corporate Disputes: A Report on the Growing Use of ADR by U.S. Corporations* (Cornell/ PERC Inst. on Conflict Resol., Ithaca, N.Y.), Jan. 1998, 11 (based on survey of Fortune 1000, the use of arbitration was found in 62% of employment disputes).  *See also Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 123 (2001) (noting that alternative dispute resolution procedures have been "adopted by many of the Nation's employers").

reasons to contemplate class claims.[6]  Indeed, the 99's publicly-available filings

with the Securities and Exchange Commission confirm the obvious, which is that it

was acutely aware, as far back as 2003, of the risk of employment class actions:

> We are subject to the risk that our results of operations may be adversely
> affected by legal or governmental proceedings brought by or on behalf of
> our employees or customers. In recent years, a number of restaurant
> companies have been subject to lawsuits, including class action lawsuits,
> alleging violations of federal and state law regarding workplace and
> employment matters, discrimination and similar matters. …

See O'Charley's Inc. Prospectus at 6 (Apr. 4, 2003), available at

http://www.sec.gov/Archives/edgar/data/864233/000095014403004636/g80721b3

e424b3.htm.

The 99 ignores its own broad language ("any and all") about the all-

inclusive scope of the agreement, as well as its repeated assurances that employees

---

[6] In addition to wage claims, there are well-established customs of class claims
with respect to other types of employment claims that would be covered under the
agreement.  For example, it has long been recognized that discrimination claims,
most notably claims alleging a pattern and practice of discrimination or claims
alleging disparate impact discrimination, are appropriately pursued through class
actions.  See, e.g., General Telephone Co. v. Falcon, 457 U.S. 147, 157 (1982)
("[S]uits alleging racial or ethnic discrimination are often by their very nature class
suits, involving classwide wrongs."); Romasanta v. United Airlines, Inc., 537 F.2d
915, 918 (7th Cir.), aff'd, 432 U.S. 385 (1977) ("Because the Civil Rights Act of
1964 attacks class-based discrimination, it is particularly appropriate that suits to
remedy violations of the Act be brought as class actions.").  Likewise, claims
alleging a breach of fiduciary duty, commonly brought under the Employee
Retirement Income Security Act of 1974 ("ERISA"), 29 U.S.C. §§ 1001 et seq.,
are regularly brought as class actions.  See, e.g., In re Schering Plough Corp.
ERISA Litigation, 589 F.3d 585, 604 (3d Cir. 2009) ("breach of fiduciary duty
claims brought under [ERISA] are paradigmatic examples of claims appropriate
for certification as a Rule 23(b)(1) class, as numerous courts have held") (citations
omitted).

were not foregoing any of their rights. Instead, it focuses on the use of singular

pronouns and descriptors (such as "I," "my," or "employee"), arguing that such

language demonstrates the parties' intent to limit arbitrations to individual

proceedings. But that argument places too much weight on language that was self-

evidently used for drafting convenience. As a practical matter, the 99 could not

enter into an agreement with its workforce as a whole; it had to enter into

agreements with individual employees. It would have made no sense to use terms

other than ones addressed to individual employees, such as "you" and "yours."

Those terms cannot be read to provide any evidence of intent with respect to class

arbitration.

The 99's reliance on the use of singular words is akin to arguing that the use

of "he" in a contract would not apply to a woman, or that the use of a singular

pronoun in a statute *necessarily* means it does not apply not more than one person.

That type of argument is plainly flawed. The point is made by language in the

FAA itself, which uses singular and masculine language, even though it plainly

applies more broadly. *See, e.g., Minneapolis-St. Paul Mailers Union, Local #4 v.

Northwest Publications, Inc*., 2003 WL 21672743, *3 & n.2 (D.Minn. 2003)

(construing language in FAA that requires service "upon the adverse party or his

attorney" and concluding that "[a]lthough the statute refers only to the possessive

form of the masculine singular pronoun, the Court will assume our wise Congress

intended for this rule of service also to apply to the Union, a nonhuman, non-gender-specific entity, and perhaps even to women!").  Likewise, the Federal Rules of Civil Procedure are replete with references to the singular, but nobody would seriously argue that they do not apply to or contemplate groups of parties.  To pick just one of numerous possible examples, Rule 4 requires that a summons "state the name and address of the plaintiff's attorney" and "state the time within which the defendant must appear and defend."  Fed. R. Civ. P. 4(a)(1).  Does this language mean that an action can be brought only by one plaintiff against one defendant?[7]

In addition to the "any and all" and non-forfeiture-of-any-rights language, other language in the agreement is entirely consistent with the claims in this case being pursued in class arbitration.  The claims arise from an allegation that 99 waitstaff employees were subject to a uniform policy that violated their rights under the wage laws – i.e., being required to pay over a portion of their tips to non-service employees.  As stated in the ADR Booklet, the principal purpose

---

[7] Likewise, the arbitration agreement's inclusion of a venue provision or reference to filing fees does not indicate that class actions are precluded.  Indeed, those provisions readily can be harmonized with a class proceeding, as they have been in this case.  The proper venue for this case is in or around the location that the respondent worked, because she is the representative claimant.  That is not materially different than the venue rules that would apply in court.  And the respondent's filing fee reasonably can be capped at $50, just as it has been in this case, regardless of whether the case is brought as an individual claim or a class claim.  That the 99 will face higher filing fees is of no moment, because the arbitration agreement does not in any way limit the 99's obligation to pay such fees.

underlying the arbitration agreement is to ensure that *all* employees are treated in a fair and uniform manner, not simply employees who have the wherewithal to come forward as representative parties:

> <u>Why are we introducing ADR to *all* Ninety Nine employees?</u>  Our mission statement supports this: We Treat People Right!  As the Ninety Nine is rapidly growing, we bring hundreds of new employees into our family each year.  The Ninety Nine believes *each employee* deserves to be treated with respect and in a fair manner. …

(ADD.9) (emphasis added).  Likewise, the 99 states that "[t]he reason [it] is offering this benefit is for *employees* to take advantage of it.  Treating People Right means giving *each* employee fair and respectful treatment at all times."  (Id.) (emphasis added).  What better way to ensure the fair treatment of all employees than by permitting a class action to challenge and remedy an unlawful wage practice?

While making the predictable and uncontroversial point that class arbitration is more complex than individual arbitration, the 99 ignores the more fundamental point that class arbitration is still less formal and costly than a class proceeding in court.  All of the benefits of arbitration that the 99 touts in its arbitration agreement continue to apply in the class context when comparing arbitration to court proceedings.  It is clear, therefore, that the real reason for the 99's petition is not to avoid arbitration, it is to avoid any type of class proceeding.  Why?  Because a class proceeding, whether in arbitration or in court, would require the 99 to account

to all of its employees.  But that attempt to avoid a class proceeding runs afoul of the stated purpose of the arbitration agreement, which is to ensure the fair treatment of *all* employees.

## **CONCLUSION**

For the foregoing reasons, Ms. Kiran respectfully requests that this Court affirm the district court's order dismissing the petition.

Respectfully submitted,
CONSTANZA KIRAN, on behalf of
herself and all others similarly situated

By their attorneys,


/s/ Stephen Churchill
Stephen Churchill (#30464)
Hillary Schwab (#118616)
Brant Casavant (#1145229)
FAIR WORK, P.C.
192 South Street, Suite 450
Boston, MA 02111
(617) 607-3260
steve@fairworklaw.com
hillary@fairworklaw.com
brant@fairworklaw.com

**Dated:**  June 24, 2014

## <u>CERTIFICATE OF COMPLIANCE WITH RULE 32(a)(7)</u>

Certificate of Compliance with Type-Volume Limitation,
Typeface Requirements, and Type Style Requirements

    1.     This brief complies with the type-volume limitation of Fed. R. App. P. 32(a)(7)(B) because this brief contains 8,260 words, including all parts of the brief except those excluded by Fed. R. App. P. 32(a)(7)(B)(iii).

    2.     This brief complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type style requirements of Fed. R. App. P. 32(a)(6) because this brief has been prepared in a proportionally spaced typeface using Microsoft Office Word for Mac 2011 with Times New Roman, 14-point type space.

/s/ Stephen Churchill
Stephen Churchill

## <u>CERTIFICATE OF SERVICE</u>

I certify that on June 24, 2014, I served a true copy of this document by electronic filing on all registered parties, and that on June 25, 2014, I served two bound copies of this document by first-class mail on the following parties:

Michael Mankes
LITTLER MENDELSON, P.C.
One International Place, Suite 2700
Boston, MA 02110
mmankes@littler.com

Tara Presnell
Jennifer Robison
LITTLER MENDELSON, P.C.
333 Commerce St., Suite 1450
Nashville, TN 37201
tpresnell@littler.com
jenrobinson@littler.com

Burt M. Rublin
BALLARD SPAHR LLP
1735 Market Street, 51st Floor
Philadelphia, PA 19103-7599
rublin@ballardspahr.com

/s/ Stephen Churchill
Stephen Churchill